3-11061 United States v. Joan Manuel Estadella. Mr. Encinoza. Good morning. Good morning. Good morning. Nice to see you, Judge. Good to see you, too. For the rest of the panel, my name is Israel Encinoza. I was court appointed to represent Mr. Joan Manuel Estadella at trial and also on appeal Before you start your argument, Mr. Encinoza, we thank you very much for taking on the appointment and your service to your client and to the court as well. We really do appreciate it. Thank you. It's a pleasure, Your Honor. Mr. Estadella is currently serving the remainder of his sentence at FCI Miami, and he's doing very well there. My first issue is that as to whether or not the, is regarding the search, the consensual search of the house where he lived at, located at 318 West 17th Avenue in Hialeah. There are several Supreme Court cases that both of us, the government and the defense, have cited, mainly Matlock and Randolph and others. But this is a unique situation. Our case is the opposite of those cases in that when Mr. Estadella refused consent to search his house, he wasn't on the premises. He was detained by the Hialeah Police Department, and he was at the police station in Hialeah. Similarly, Mr. Soriano was also not at the house in question. He had moved out, and he was living with his stepdaughter, Dianely Estadella, in the east side of Hialeah, in a different address. I believe he moved out a week before. How it all started was the Hialeah Police Department, through closed-circuit TV videos, were examining a scene at a hotel in Okeechobee Road called the Star Motel. When they reviewed the video, they picked up a segment of the video of a van of the two suspects that got into the van to drive away from the scene. The van had a contractor's license number, and thereafter, Detective Mui assigned Sergeant DeLima to go to do a search and determine who the contractor's license belonged to. That's how they traced the license number and the van to the address. The address, correct, Your Honor. Now, you don't have much time, so I just want to see if I can get you right to the heart of the issue on the suppression motion. Yes. The district court found that there was consent given by the stepfather and by the sister. Right. You think both of those were not valid consents? I don't think either one was valid consent. Why was the, okay, tell me why you think the, if the quit-claim deed has any bearing on the scenario, why wasn't the stepsister, the sister, competent to give consent to the search of the house that she now owned? Yes. She owned the house as of November 23rd. And if the quit-claim deed wasn't effective because it hadn't been filed, why wasn't the stepfather able to give consent? Well, the court determined that under Florida law, the quit-claim deed transferred the title to the stepdaughter, DeAnne Ellis. Why wasn't she able to give consent then if that's what happened? Because the Fourth Amendment doesn't pertain to property. The Fourth Amendment doesn't protect, involve property rights, ownership rights. It involves whether or not there is joint access or control, or whether they cohabitate or are co-occupants who have a right to possess the property. The fact that you own a property and somebody else is living in it is most likely a landlord-tenant relationship, which under Chapman, that's, you can't, a landlord cannot just simply tell the police, okay, I'll give you consent to go into the tenant's house. That's a no-no. For that reason, the fact that she got titled to the property... Let me ask you a question in that regard. So we have, if I have the facts right, a quit-claim deed transferred title in fee simple to Danielle's. Under Florida law, it was effective at the time she got titled. It didn't have to be recorded, if I have Florida law right. That's correct, except I don't... Just bear with me for a sec. And thereafter, she gives consent, and there's no co-occupant who says, no, don't give consent. So the unambiguous record is, the title holder who occupied the house gave consent. A co-occupant gave consent, and no one else who might have had any interest in the property said no. Why wouldn't, under those circumstances, that consent be valid? Okay, let me see if I understand correctly. The co-occupant, you mean Mr. Soriano? Yeah. Okay, Mr. Soriano had moved out of the house. There was never any police reports filed about any abuse cases. There was no medical reports filed. And what I find out, Your Honor, is the fact that the police, in this case, when they went to Danielle's house to get consent from him, not from her, they didn't specify in any police report the fact that he had, that they mentioned the quick claim deed, that he transferred title, that Danielle's was now the owner. They didn't talk about any incidents of violence to Detective Esotegui or Pelaez. I mean, those things, I believe a reasonable police officer would have written a report on that. And none of that is ever mentioned until the time that we file our motion to- Let me ask you, is there any occupant or co-occupant of the property, based on the record that we have, who said no, I don't consent? Yes, it would be the- Who would have said I don't consent? My client's girlfriend, Joanna Quevedo, did not consent to the search. The only other occupant of the house at that time was Mr. Estadella's minor son. And Mr. Estadella- Where was Mr. Estadella staying at the time? It was- Your client. My client, it was the Hialeah Police Department when he refused- No, no, no, no, I know that where he was when he refused consent, but where was he living? He was living at that address, at 318 West 17th. You consider him to have been an occupant? He's an occupant of the house also, and also his living girlfriend was an occupant of the house. Now, the records show that the company was, his company was registered to that address, and that his van was also registered to that address. Help me with that. Does the living girlfriend say, as a co-occupant, I object and I do not give consent to search the house? She also said that at the police station. She was questioned for hours, I believe, and for several times she was questioned. So your position, I don't want to put words in your mouth, but your position is that the consent of the stepfather and the sister were not valid against his objection. Exactly, Your Honor, because they did not cohabitate at the house in question at the 318 address at that time. And that's what the law looks at, primarily. Okay, you've got about a minute left if you want to touch on any of the other issues. The other issue was the, I don't think I, well, the judgment of Acuero as to count three, specified that he was, that he had possession and intended to distribute the meth, the 30 grams of meth, which was approximately $700 on December 30th to December 1st. And I know that's flexible, that time is flexible. But it specified that time, and there's no evidence that Mr. Estadela was around that house at that time presented by the government. Can I ask you a question about that? Yes. That is to say whether he was in possession, whether there was sufficient evidence from which a jury could find beyond a reasonable doubt his possessory interest in the meth, which is found in that room. Do I have the facts right that the controlled substance was found in a room where he had on a wall his own picture superimposed on top of a picture from a movie called Scarface, where the likeness of Tony Montana is in the wall and his picture is superimposed on top of the face in the room where the meth was found? Yes, Your Honor. That would be accurate? That was the office room. There was office papers in there. But I'm talking about, is that where the meth was found, in that room? Yes, Your Honor. Yes, and there was dispute as to whether or not Mr. Estadela's face was the one superimposed. I believe Detective Gatto testified that he didn't know who this face was. A couple other detectives testified that it was the face of Mr. Estadela. And I personally, I couldn't tell. Let me ask you, couldn't a jury infer, they need not, but couldn't they not fairly infer from his picture being on the wall in the room where the meth was found, that he had a possessory interest in that room, and in the dope found on the desk or on top of the desk? If he was the only one that had access to the room, perhaps, but there was people that would come in and out of the house, Your Honor. Was there a padlock on that door to that room? There was a padlock, yes, Your Honor. And it was broken down by the police, and that's how they got in. Thank you so much. I want to go back a minute to Soriano. Did your client ever tell the police that he lived at the house? Yes. Okay. No, Soriano is not my client. Soriano's a- No, I'm not. Your client told the police that Soriano lived at the house. That's what one of the detectives testified. I understand. I'm not saying whether it's true or-  That's correct. I'm just trying to understand that your client told the police at the time before they did the search that Soriano lived at the house, right?  That's what the detective moved- That's what they thought. Moved and testified to it. And you don't dispute, he maybe didn't live at the house. He had maybe just moved out, but the detectives did think Soriano lived at the house or had some basis. Well, my client, the detective claimed that my client told him during the interrogation at the police station that the stepfather lived at the house. All right. And secondly, it is true that he did live at the house until shortly before the search. Is that part correct? Yes, he lived in the house there. He moved out about a week before, roughly. Okay. He was moved out by the boyfriend of one of his granddaughters. Okay, so we have both that he was living there except for a few days or a week before the search. He still had title to the house and your client allegedly, I mean, the district court found, it seems like we have a fact finding, there was an evidence you're hearing, correct? Yes. And the district court found that your client told the police that Soriano lived at the house. Yes. Have I got that wrong? Okay. I just want to make sure I understood the record. Thank you very much. Thank you. All right. Thank you, Mr. Encinos. You've saved your full time for rebuttal. Mr. Sachs. May it please the court. Ethan Sachs on behalf of the United States. I'd like to start with the suppression issue that we've been discussing this morning. The court should affirm the denial of the suppression motion for three reasons. The first is that the police received consent from what we understand to be disputedly the house's owner, Estedea's sister, Dani Ellis. Second, the police received consent from Lozaro Soriano, Estedea's stepfather, who was a co-possessor of the home. And then third, police could reasonably believe, and in fact, I think did believe at the time that Soriano was the owner of the home and thus had the ability to consent to the search as the owner. What does the law say, Mr. Sachs, about the owner of a property consenting as against the objection of a tenant? Sure. So I think in the landlord-tenant context, we acknowledge that courts have said in Chapman and other cases that a tenant has a reasonable expectation of privacy in a place, typically in a place that they are renting from a landlord. And I think the courts go into that, you know, a tenant doesn't expect reasonably for their landlord to be coming into the house or letting people into the house. We haven't found any case, and I don't think Mr. Estedea points to any case, where that's true for a family member who is a co-possessor of the house. So just to be clear. Why should there be, and I understand, I looked too and I couldn't find anything either, but why should there be a difference for a family member who has a room at a house owned by a parent, an uncle, a relative, and makes that room his or her own as against the world? So I think in a hypothetical case, there could be, I'm not saying in no case, could a family member have that situation. I think in this case, though, is a good example of why typically that's not the situation. There's no testimony or evidence here about who controlled exactly what room, aside from this back room, which Daniela testifies is Mr. Estedea's office. But it's a shared house, if you will. So it's not as if this is some stranger who's renting one room. But I think the other fact that reveals sort of why this is different is because Mr. Soriano, all of his possessions, basically, aside from his bed and bed stand, were still in the house. And even his dog lived still in the house. There's a record. Tell us that. Yes. I can give Your Honor sites of the findings. Most of his belongings at the home, that's at docket 128 at page 217. And we mentioned that in our brief, too. In fact, during the searches here, Mr. Soriano was allowed to take his dog. So I think that's just different as a factual matter. Typically, landlords don't have their stuff living with the tenant. So I think that creates a different reasonable expectation of privacy. That's certainly not the case in today's world. I mean, you have multi-room houses where, because of the economy and other sorts of pressures, rooms are being let out. And so the landlord is living with the tenant. Absolutely, Your Honor. And I'm not asking, and we're not asking for any rule that makes a clear distinction, necessarily, between the two. We think the circumstances of each individual case should dictate whether the defendant has a reasonable expectation of privacy. We don't understand, Mr. Estede, to have furthered that argument here. And I think in a hypothetical case, a landlord potentially could. There could be a family member relationship that is more like a landlord-tenant. Our only point is that here, there is not that type of relationship. One final question on the suppression issue, at least from me. What about that back room that the government claimed and people said was Mr. Estede's room? Does he have an expectation of privacy that prevents consent being given by someone else to enter that room? I don't think so. I don't think there's anything in the record. I think theoretically, I'm not saying that couldn't be possible. But I think on the facts here, that hasn't been borne out. Because all Danielle has testified was that he had general, that was his office. She didn't say that nobody else ever went there or that he exclusively accessed that place. And I think he admits, I think he made the argument that his girlfriend, Ms. Coveto, at times went in there. I think he said that today at argument. So I don't think there's anything that the officers could have known, at least, when they were talking with Soriano and receiving consent, that that was limited in some ways from where he could go. And I don't think there's anything to suggest that Mr. Estede would have had a reasonable expectation of privacy in that room as his own. I think all the testimony is that the house was shared among the family members. One final question. Sure. Was there any testimony about who had padlocked the room or who had the key to the padlock? I believe that the padlock was Mr. Estede had imposed. And at least the effect that the, I think what the evidence is, is that the officers could not get in with the code. Which suggests, because they were with Soriano at the time, that he at least didn't know the code. And so therefore they kicked down the door. So I do think that's in evidence. But I don't think there's anything beyond that, that nobody ever went in there, or that Mr. Estede had kept everything in there completely private from others. Mr. Sachs helped me with the facts as well on the suppression hearing. I just have two questions in that regard. There was consent from the title holder. There was consent from Soriano. Does the record reflect that other co-occupants to which either the girlfriend or the defendant said no, I do not consent? And if the answer is they did say no, where and when did they say no in relationship to the sequence of events before they actually go in without a warrant? Sure. So the only person who says no, based on our understanding of the record, is Mr. Estede himself. And he says no after he has been arrested and taken to the police station where he is being interviewed. So we think it's undisputed that yes, he did object to it then. Subsequently, the officers went and spoke with Mr. Soriano and Danielis Estede, because they had been told that he is the owner, that Soriano was the owner. So just so I have the record crystal clear, before they enter without a warrant, they're told by the title holder and Soriano they can go in. But before they went in, they also had the statement from the defendant, I object. I don't consent to search. That is correct. Okay. I'm sorry, I didn't mean to cut you off. One thing I'd just like to point out is that I think it is undisputed that when Mr. Estede objected, he was under arrest at the police station. I understand. And Fernandez... Does that somehow vitiate his refusal to consent? Does he lose the right to say, I don't want you going in my place even though I'm under arrest and you haven't gone in there yet? Yes, I believe so, Your Honor. I think Fernandez v. California makes pretty clear that the exception, the objection under Georgia v. Randolph, the person, the objector must be physically present at the location to be searched for his objection to be valid. And Fernandez, in fact, goes on and speaks to just this type of situation and says, even if the objector is not present because... If I have title of property, I own a summer home in the Berkshire Mountains, and they want to search that home, but my main residence is in Miami, Florida, and I say I don't consent, that's vitiated because I'm not physically present in the home before they go in? So I may have misspoke. As compared to if a second equal co-possessor gives or co-owner gives consent to search, I think your objection is vitiated. Okay. So if there are two... Correct. You have an expectation of privacy, and one says yes, and one says no. The person saying no has to be on the premises. Right. That's what Fernandez... You say that's the controlling law. Correct. All right. If he had consented while at the police station, would his consent have been valid? I believe so. Yes, Your Honor. How does consent become valid when you're not physically present? An objection to consent gets vitiated if you're not physically present. That's a fair question. It's a fair question, Your Honor. We're just taking that straight from what Fernandez in the Supreme Court... Is that holding on both ends of the equation, or was a part or half of the equation dicta? Do you follow why I'm saying it? Yeah. Yes. I don't think actually Fernandez spoke to... I don't think there's a specific case that, at least we're aware of, that says specifically addresses whether consent is valid depending on the location. We read the cases to say that consent is valid no matter where it is given, so long as it's voluntary and... Here's the potential problem with reading that... And I'm not saying that affects this particular appeal, but with reading that language too broadly. Police arrest a tenant, right, where he... A place that he rents, right? They arrest him right there as he's about to go in. And before they ask him for consent, they take him to the police station. And then they ask him for consent at the police station. And he says, no, at the police station. The way you read Fernandez, he can't object. But if they had asked him at the doorway when they arrested him, he could object. That doesn't make any sense for Fourth Amendment purposes. It's just illogical. If consent is valid away from the premises, an objection has to be valid if away from the premises too. I take your... At least that's what it seems like to me. I take your Honor's point, and I don't think we've taken a position necessarily in this case about where... Does that matter here? I don't think it matters. Tell me why not. Because Mr. Soriano and Danielas gave consent at Danielas' house, but then with the officers went to the location of the search. And in fact, Mr. Soriano let the officers into the house using his key to the home, which is him providing his consent and authority to do that. So he's clearly at the location. But if they had been non-relatives and just landlord-tenant, they couldn't have consented to a search of his room over his objection, right? I think potentially that may be true based on Chapman and the cases. But again, those cases focus very heavily. And I think one of the confusing things is that the Fourth Amendment has these two tracks. It has who has the possessory property interest, and then also who has a reasonable expectation of privacy in the property. And those cases focus very much, the landlord cases, focus very much on the reasonable expectation of privacy. So I do think, yes, when there is a landlord-tenant relationship of payment going on and the landlord doesn't live there or maybe has some relationship, as Your Honor mentioned, where they live in one room and not others, perhaps that's a different circumstances. But that's just not what we have here. Here we have family members who are living together. And one thing I'd be remiss not to mention is that he moved out only because, as a district court found, he was beaten. You mean Mr. Soriano? Mr. Soriano moved out only because he was beaten by Mr. Estradaia. And so I think that just highlights how different these circumstances are from any potential hypothetical case where there are difficulties in some, maybe some obscurity between a landlord slash family member relationship. Let me ask, follow up with one other thing. Mr. Encinosa said the problem you have is even though you had consent from the title holder and you had consent from Soriano, you had objections from two co-occupants. One, we've established, was the defendant. After he was under arrest, he was in the police station. He said, you can't go in there. Second, he said, and just help me factually with this, that his girlfriend, who also was a co-occupant, also said she did not consent and she was not under arrest or in police custody at the time. Is that factually accurate? We do not think so. We don't think the record says anything. I'm glad Your Honor asked. Anything about Ms. Covado, the girlfriend, consenting or objecting. There's no record evidence that the girlfriend objected to the search. I'm not aware of any. I didn't see any in the briefs and I didn't see any in reviewing the record below. I don't see anything that would suggest that. Today is the first time I'm hearing. Is she a co-occupant? I'm not sure how much that was thoroughly developed, but I think yes. I don't think we have any dispute or, you know, this issue wasn't really raised, so I don't think it was fleshed out super much, but I don't think we're disputing that she was a co-occupant. The whole consent boils down to the title holder said yes. Soriano, who lived there, said yes. And the defendant, who was also a co-occupant while under arrest, said no. That's right. Not the essential facts. That is, and if I could just add one thing onto that, Your Honor, is that not only was Soriano a co-possessor, the police reasonably believed that he was the owner of the house. And so reasonable belief, they thought he had the authority as the owner of the house. So I think that's the third reason. But, Your Honor, they actually ran a check to see who owned the title before they got there at some point and found out he was still the title holder. That's correct. They looked on the appraiser's website. What is the role here of apparent authority? Does it mean the search is okay, or does it mean it comes within the good faith exception? What is the role of apparent authority here? I think the good faith exception relies, speaks more to cases where the warrant has been issued and officers rely on the warrant in good faith. Here, the case law says that so long as officers reasonably believe that the person giving consent had the apparent authority to consent, then that is okay. Your Honors, don't need to reach that here. I'm just mentioning it as a third independent reason for why the search here was okay. But the apparent authority would be an independent basis for the search. Correct. Independent of the theory that they proceeded in good faith. Absolutely. If Your Honors have no further questions, we'd ask that you defer. All right. Thank you very much, Mr. Sachs. Counsel, could I ask you a question at the outset? I understand that your client objected when he was in custody at the police station to the search. Mr. Sachs says the girlfriend, who may have been a co-occupant, never said anything about consent or no consent. Is there something in the record where she said, I too object to the search of that place? Your Honor, I'm sure she did that. I don't know if it's in the transcript for the suppression hearing or in the transcript for the trial. But I know definitely that I believe it was Detective Mui. She was questioned at the police station on November 30th several times and there is a police report that mentions it. But again, that would be my fault. So your answer is there's something in the record that she did object, whether she objected at the evidentiary hearing the district court held on suppression or she said it at the trial is not clear. But at some point in the record, she did object. She, I'm sure she objected. The problem is after this incident happened, she gets evicted from the house by Dinelli. She becomes homeless. And I actually had to track her down living in a warehousing alley at one time. After that, I lost track of her. So she never testified on any of the hearings. It would have been developed by me. Did she testify at trial? No, no, she wasn't around. We couldn't find her. So she didn't testify at the evidentiary hearing and she didn't testify at the trial. Right. But I believe. So you think maybe there's a police report where somebody, she said something like that to one of the cops. There is a police report or I might, I may have asked one of the detectives, probably Mui, Detective Kenshin Mui or another. You mean in the trial? At the motion to suppress hearing or at the trial. Thank you. Your Honor, and with regards to the reason when it was said that the police determination of consent, it must be judged not whether the police were correct in assessing it, but objective standards, whether the facts available at the moment will warrant a personal reasonable caution in belief that the consenting party had authority over the premises. And again, our position is our client from the get-go said, I object. Neither Mr. Soriano and especially Dianelis, who was living at her house in East Hialeah, they, they had, they weren't cohabitating and therefore didn't have a possessory interest in the property at that time when he consented. So that's my position with regards to that. Are there any other questions? Thank you very much, Mr. Encino. So thank you very much, Mr. Sachs.